UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

RAMON FABIAN AND VICTOR VASQUEZ,  :
                                  :
                       Plaintiffs,  :
                                  :
          -v -                    :
                                  :
THE CITY OF NEW YORK, NYPD POLICE  :
OFFICERS JOHNS DOES ##1-__, in their  :
individual and official capacities as employees of the  :
City of New York Police Department,  :
                                  :
                       Defendants.  :
-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/9/18

16-cv-5296-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

"Get out, get out!" These were the words that Plaintiffs heard as two police officers cocked

and pointed their guns at Plaintiffs through the windows of their stopped truck. These were also the

words that initiated an encounter during which Plaintiffs were pulled from their truck, dragged onto

the ground, and kicked by police officers. As a result of that encounter, Plaintiffs filed this lawsuit,

bringing claims under 42 U.S.C. § 1983 ("Section 1983") against the City of New York and unnamed

"John Doe" police officers for excessive force and denial of medical care. According to Plaintiffs,

the City's failure to properly train its police officers condoned and fostered the police officers'

unlawful use of force. And the City's failure to discipline its police officers led the officers here to

believe that their actions would go unpunished.

Such allegations are common among plaintiffs asserting Section 1983 claims against the City

of New York. Less common, according to the Office of the Inspector General ("OIG") of the New

York City Police Department ("NYPD"), are allegations of unlawful force that are ultimately

proven. Of the more than 10,000 use-of-force complaints presented to the Civilian Complaint

Review Board ("CCRB") between 2010 and 2014, only two percent were substantiated. After

analyzing the substantiated complaints, the OIG explained in an October 2015 report that of the

officers involved in the substantiated complaints, only six percent had been on the force for as long as the individual officers involved here. While the report identifies deficiencies in the NYPD's training program and disciplinary procedures, it also makes recommendations for improvement and highlights changes that the NYPD has already made since 2014 to address those deficiencies. It is this report, and only this report, that forms the factual basis for Plaintiffs' claims against the City.

The City of New York has moved for summary judgment on the claims against it. Because the 2015 OIG Report is insufficient evidence of the City's liability in this case, the City's motion for summary judgment is GRANTED. And because Plaintiffs failed to name or serve the John Doe police officers, the claims against those defendants are also dismissed.

## I. BACKGROUND[1]

### A. Factual Backdrop

The issue presented by Defendant's summary judgment motion is whether Plaintiffs have put forth sufficient evidence on which a reasonable jury could conclude that the City of New York is liable for the constitutional violations that Plaintiffs allege they suffered at the hands of NYPD officers. While the underlying facts of Plaintiffs' encounter with NYPD officers do not drive that determination, they are recounted to provide the context in which Plaintiffs' claims arise.

On July 8, 2015, Plaintiffs Ramon Fabian and Victor Vasquez were working for Chopped Commissary, delivering food to Chopped clients in Manhattan. Pl.'s Response to Def.'s Rule 56.1 Statement, ECF No. 51 ("Pl.'s 56.1") ¶¶ 1-2, 5.[2] Their shift was scheduled to run from 6:00 p.m. to 3:00 a.m. the following day. *Id.* ¶ 2. Plaintiffs were travelling in a white, commercial box truck. *Id.* ¶ 3. The word "Chopt" was inscribed on the truck. *Id.* ¶ 4. Sometime after midnight, Plaintiffs

---

[1] The following facts are drawn from the parties' Local Civil Rule 56.1 Statements in connection with the instant motion and are undisputed or taken in the light most favorable to Plaintiffs, unless otherwise noted.

[2] Plaintiffs' Response to Defendant's Rule 56.1 Statement contains both the assertions of the moving party and the responses of the non-moving party.

stopped the truck on 43rd Street, between Lexington Avenue and Third Avenue, for approximately forty minutes while making a delivery. *Id.* ¶ 5.

New York City Police Officers John Paul Leddy and Michael Pappalardo of the Seventeenth Precinct were on duty that night. *Id.* ¶ 6. That their paths crossed with Plaintiffs' that night is undisputed. Many of the events that followed are a matter of dispute, however.

Defendant maintains that Officers Leddy and Pappalardo were notified that a phone had been stolen from a box truck at the location where Plaintiffs had parked. *Id.* ¶ 7. In Defendant's telling, the officers responded, and upon arriving at the scene, Officer Leddy observed two men standing over a woman, groping and grabbing at her while yelling at her. *Id.* ¶¶ 8-10. Officer Leddy spoke with the woman, who explained that the two men had grabbed at her belongings and accused her of taking items from their truck. *Id.* ¶ 11. After Officer Leddy separated the woman from the two men, the men headed back to their truck, and the officers left the scene to resume their patrol. *Id.* ¶¶ 12-14. Only a few minutes had passed when the officers were called back to the scene. *Id.* ¶ 15. The woman informed the officers that the two men again had screamed at her and attempted to take her bags. *Id.* ¶ 16. The men left the scene, however, prior to the officers' return. *Id.* ¶ 17. The officers canvassed the area for the white box truck and the men who had fled. *Id.* ¶ 18. They encountered a box truck that was driving northbound on Third Avenue and pulled the truck over. *Id.* ¶¶ 19-20.

Plaintiffs, on the other hand, claim that the interaction with the woman never occurred. *Id.* ¶ 10. Instead, they claim that they were headed back to their base after completing their delivery at 43rd Street when they noticed police lights in their rear view mirrors. Def.'s Response to Pl.'s Statement of Additional Material Facts, ECF No. 57 ("Def.'s Resp.") ¶¶ 60, 62.[3]

---

[3] Defendant's response to Plaintiffs' statement of additional material facts contains the additional factual statements of Plaintiffs and Defendant's responses to those statements. Defendant objects to nearly every additional statement, largely on the grounds that the facts are duplicative of those contained in the original 56.1 Statement or are not material to the summary judgment motion. While the Court agrees that many of the facts contained in the additional statement are not

3

The parties agree on the key aspects of what happened after the truck was stopped by the police officers. As the officers approached the truck on either side, the officer at the passenger side cocked his gun and pointed it at both plaintiffs, saying "get out, get out, get out." Pl.'s 56.1 ¶¶ 22-23. Mr. Fabian initially did not respond verbally, nor did he voluntarily exit the vehicle. *Id.* ¶¶ 24-25. So one of the officers opened the truck door, grabbed Mr. Fabian by his tank-top, and started pulling him out of the truck. *Id.* ¶ 26. Then Mr. Fabian began to cooperate, first removing one leg from the truck and eventually hopping out of the truck onto the ground. *Id.* ¶ 27-28. Mr. Fabian landed on his feet, but the officer then tripped him, causing him to hit his chest and face on the ground. *Id.* ¶¶ 28-30. The officer then put a knee on Mr. Fabian's back, which he held there for approximately one minute while bending Mr. Fabian's arms back to handcuff him. *Id.* ¶¶ 32-33.

On the other side of the truck, Mr. Vasquez was pulled out of the vehicle and dragged onto the ground. *Id.* ¶ 38. Mr. Vasquez landed on his knees. *Id.* ¶ 40. The officer held his knee to Mr. Vasquez's upper back while he handcuffed him. *Id.* ¶ 41. The process of removing Mr. Vasquez from the truck and handcuffing him lasted no more than one minute. *Id.* ¶ 42. During this process, neither Plaintiff complained about his physical well-being or requested medical attention. *Id.* ¶¶ 35, 44.

While Mr. Fabian sat handcuffed on the ground, the officers explained to him that they had received a call about a theft. *Id.* ¶¶ 35, 46. The complainant was then brought to the scene by another patrol car, and Mr. Fabian was told that officers were waiting for someone in the patrol car to identify Plaintiffs. *Id.* ¶¶ 47-48. The complainant, however, had become uncooperative and declined to pursue her complaint any further. *Id.* ¶ 49. The officers removed Plaintiffs' handcuffs and told them they were free to leave. *Id.* ¶ 50. The entire interaction with the officers lasted

material to this motion, the facts provide useful background information. The Court has accordingly included those facts that are supported by the record and that it deems appropriate to explain the factual backdrop of Plaintiffs' claims against Defendant.

between forty-five mintues to one hour.  *Id.* ¶ 51.  After they were released, Plaintiffs returned to their base.  *Id.* ¶ 52.

When he finally returned home from his long shift, Mr. Fabian showered, took Tylenol, and went to bed.  *Id.* ¶ 53.  Mr. Vasquez cleaned blood from his knees but did not take any medication.  *Id.* ¶ 54.  The following day, Mr. Fabian returned to work and completed a full shift.  *Id.* ¶ 55.

On July 10, 2015, Mr. Fabian sought treatment at Montefiore Hospital for back and shoulder pain, as well as a headache.  *Id.* ¶ 56.  He was informed that he had no broken bones and was given painkillers.  *Id.*  Mr. Vasquez also went to Montefiore Hospital, complaining of knee, shoulder, and back pain.  *Id.* ¶¶ 57-58.  Like Mr. Fabian, Mr. Vasquez had sustained no fractures.  *Id.* ¶ 58.

Three months later, the NYPD OIG published its findings in connection with a study that it had conducted into substantiated complaints of excessive force filed with the CCRB between 2010 and 2014.  *See* Declaration of Ralph DeSimone, ECF No. 52 ("DeSimone Decl."), Ex. G.  The report, published on October 1, 2015 and titled *Police Use of Force in New York City:  Findings and Recommendations on NYPD's Policies and Practices* ("OIG Report"), comments on the adequacy of the training programs and training materials available to NYPD officers.  The report contains various statistical findings regarding the substantiated use-of-force complaints and provides recommendations for improvements to the NYPD's use-of-force and de-escalation training programs.

### B. Procedural History

Plaintiffs initiated this suit on July 5, 2016, bringing claims against the City of New York and "NYPD Police Officers John Does ## 1-__."  ECF No. 1.  The City of New York answered the complaint on October 31, 2016.  ECF No. 10.  This matter was designated for participation in the district's Plan for Certain Section 1983 Cases Against the City of New York pursuant to Rule 83.10 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of

New York, formerly known as the "Section 1983 Plan."  ECF Nos. 9, 13.  As part of that program, identified categories of discovery are required to be exchanged between the parties.  Mediation under that plan was conducted but was unsuccessful.  ECF No. 14.

The Court held an initial pretrial conference on January 24, 2017 and issued a case management plan and scheduling order the same day.  ECF No. 17.  Among other things, that order set deadlines for amendments to the complaint to add parties and for the completion of discovery. Following the close of discovery, on December 22, 2017, the City of New York filed a motion for summary judgment.  ECF No. 43.  On February 8, 2018, the City also filed a motion to preclude the testimony of one of Plaintiffs' experts, Walter Signorelli.  ECF No. 61.

During discovery, the two police officers involved in the July 9, 2015 interaction with Plaintiffs were identified as Police Officer John Paul Leddy and Patrol Officer Michael A. Pappalardo.  However, at no point during litigation of this matter have Plaintiffs sought leave to amend their complaint to correctly identify the John Doe police officers.  Because the officers have not been named, unsurprisingly, they have not been served.  Therefore, the City of New York is the only defendant in this matter.

## II.    LEGAL STANDARD

Defendants are entitled to summary judgment on a claim if they can "show[ ] that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the

governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To defeat a motion for summary judgment, a plaintiff "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citations omitted). A plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted). The Court's job is "not to weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002); *see also Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (citation omitted). "[T]he judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 553 (alterations in original) (quoting *Anderson*, 477 U.S. at 252); *see also Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 400 (S.D.N.Y. 2012) ("To avoid summary judgment, all that is required of the non-moving party is a showing of sufficient evidence supporting the claimed factual dispute as to require a . . . jury's resolution of the parties' differing versions of the truth." (citing *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 206

(2d Cir. 2006))).

## III.  DISCUSSION

### A.  Federal Claims Against the City

The complaint asserts claims under 42 U.S.C. § 1983 ("Section 1983") for use of excessive force, denial of medical care, and for municipal liability.  To establish a claim under Section 1983, a plaintiff must show that there has been a denial of a right, privilege, or immunity secured by the Constitution or laws of the United States and that the deprivation of such right occurred under color of state law.  *See* 42 U.S.C. § 1983; *West v. Atkins*, 487 U.S. 42, 48 (1988).  "Section 1983 does not in and of itself create any substantive rights; rather, a plaintiff bringing a § 1983 claim must demonstrate a violation of an independent federal constitutional or statutory right."  *Watts v. N.Y.C. Police Dep't*, 100 F. Supp. 3d 314, 322 (S.D.N.Y. 2015) (citing *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 617-18 (1979)).

As a threshold matter, although Plaintiffs allege excessive-force and denial-of-medical-care claims directly against the City, those claims cannot proceed against the City except under a theory of municipal liability.  The factual allegations of the complaint make clear that it was the individual police officers who allegedly used unlawful force and were indifferent to Plaintiffs' medical needs.  *See* Compl., ECF No. 1 ¶¶ 24-25.  It is well settled that "a municipality cannot be made liable [under § 1983] by application of the doctrine of *respondeat superior*," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986), but rather the plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury," *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (internal quotation marks omitted).[4]  Therefore, "[t]o hold a city liable under § 1983

---

[4] Despite this well-settled principle—that a city cannot be held liable under Section 1983 on the basis of a *respondeat superior* theory—Plaintiffs insist on arguing in their opposition papers that the City of New York is in fact vicariously liable for the conduct of Officers Leddy and Pappalardo.  *See* Pl.'s Mem. in Opp. to Mot. for S.J., ECF No. 53 ("Pl.'s Opp.") at 7-10.  In fact, Plaintiffs state that "to charge the City via its officers with an excessive force claim under Section 1983 in violation of Plaintiffs' Constitutional rights, *all that needs be shown* is that a police officers' application of force is excessive, if it is 'objectively unreasonable in light of the facts and circumstances confronting them, without

for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).

A plaintiff may satisfy the "policy or custom" prong in one of four ways: by proving the existence of (1) a formal policy, *see Monell*, 436 U.S. at 690; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights, *see Pembaur*, 475 U.S. at 483–84; (3) a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive knowledge of policymakers, *see Monell*, 436 U.S. at 690-91; or (4) a failure to properly train or supervise municipal employees that amounts to "deliberate indifference to the rights of those with whom municipal employees will come into contact," *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996). In addition, a plaintiff must show that there is a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Triano v. Town of Harrison, N.Y.*, 895 F. Supp. 2d 526, 531 (S.D.N.Y. 2012) (quoting *City of Canton*, 489 U.S. at 385); *see Mitchell v. City of New York*, 841 F.3d 72, 80 (2d Cir. 2016) ("A plaintiff must also demonstrate a sufficient causal relationship between the violation and the municipal policy or practice." (citing *Monell*, 436 U.S. at 694-95)).

As explained earlier, Plaintiffs have not identified any individual defendants. They have not attempted to amend the complaint to allege claims for excessive force and denial of medical care against Officers Leddy and Pappalardo, for example. The complaint contains allegations, however, that the unnamed police officers violated Plaintiffs' constitutional rights. A constitutional violation

---

regard to the officers' underlying intent or motivation." *Id.* at 10 (emphasis added) (citation omitted). Plaintiffs clearly misunderstand the nature of liability that may attach to the City under Section 1983. This misunderstanding may illuminate their failure to name the individual officers in this suit.

is an element of a municipal liability claim. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("[None] of our cases authorize[ ] the award of damages against a municipal corporation based on the actions of one of its officers . . . [i]f a person has suffered no constitutional injury . . . ."); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (where "district court properly found no underlying constitutional violation," it was not necessary to consider claims of municipal liability under *Monell*); *Levy v. Alfano*, 47 F. Supp. 2d 488, 498 (S.D.N.Y. 1999) ("It is well settled that a municipality may not be held liable where there is no underlying constitutional violation by a municipal official." (citation omitted)). Here, however, the Court need not determine whether Plaintiffs have demonstrated that a dispute of fact exists with respect to the alleged constitutional violations. This is because Plaintiffs present no evidence of a formal policy or a pattern or practice of excessive force and denial of medical care by the New York City Police Department ("NYPD") such that the City could be held liable in this case under *Monell*.

In their complaint, Plaintiffs allege that the City is liable for the alleged constitutional violations of the police officers because the City failed to properly train, instruct, and discipline officers and repeatedly failed to enforce NYPD rules and regulations. Compl. ¶¶ 51, 54. The City has moved to preclude the testimony of Plaintiffs' expert, Walter Signorelli. ECF No. 61. Signorelli's report opines on the conduct of the individual officers. *See* Declaration of Zachary Russell Bergman, ECF No. 62 ("Bergman Decl."), Ex. B at 4-8. Specifically, Signorelli opines that Officers Leddy and Pappalardo violated standard police procedures and practices when, among other things, they arrested and used force against Plaintiffs. *Id.* ¶ 20. Signorelli does not, however, comment on any policy or custom that may have driven or permitted such violations. Therefore, the Court does not consider Signorelli's opinions in evaluating the City's summary judgment motion

and need not decide the City's *Daubert* motion at this time.[5]

## 1. Failure to Train

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). In order for municipal liability to attach under Section 1983, "a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id.* (quoting *City of Canton*, 489 U.S. at 388). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (internal quotation marks and citation omitted).

To establish deliberate indifference in the context of a failure to train claim, a plaintiff must show that (1) the municipality knows "to a moral certainty" that its employees will confront a given situation, (2) "the situation either presents the employees with a difficult choice of the sort that training . . . will make less difficult or [ ] there is a history of employees mishandling the situation," and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992) (citations omitted); *accord Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (internal quotation marks and citation omitted). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 62. Moreover, "[a] training program must be quite deficient in order for

---

[5] The Court observes that the proffered expert testimony—that the officers' acts violated City policy—could be viewed as inconsistent with Plaintiffs' position that City policy contributed to the officers' alleged constitutional torts.

the deliberate indifference standard to be met:  the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing."  *Reynolds v. Giuliani*, 506 F.3d 183, 193 (2d Cir. 2007) (quoting *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 27 (1st Cir. 2005)).

Plaintiffs appear not to have developed any facts to support their theory of municipal liability during discovery.  As the sole evidence presented here to support a failure-to-train claim, Plaintiffs point to the October 2015 report authored by the OIG.  Plaintiffs assert somewhat oracularly that the report shows that "the City and NYPD have a firmly established practice within the NYPD."  Pl.'s Mem. in Opp. to Mot. for S.J., ECF No. 53 ("Pl.'s Opp.") at 13-14.  More specifically, Plaintiffs proffer that the report shows that the NYPD's "current use of force policy" provides police officers with little guidance; that the NYPD Patrol Guide lacks proper instruction on how to de-escalate encounters with private citizens; and that NYPD training "does not adequately focus on de-escalation."  *Id.* at 14.

The 2015 report analyzes 207 substantiated allegations of force between 2010 and 2014.  DeSimone Decl., Ex. G at 1.  Based on that analysis, the report reaches a number of conclusions, including that the NYPD's use-of-force policy in place at the time was "vague and imprecise" and that, while the NYPD Patrol Guide prohibites "excessive force," police officers were given "few clear-cut rules" to apply in determining what constitutes excessive force.  *Id.* at 3.  The report also concludes that the Patrol Guide at the time did not properly instruct officers on how to de-escalate confrontations with members of the public, and that police officers in general were provided insufficient training on de-escalation.  *Id.* at 3-4.

The Second Circuit has yet to address the question of whether the 2015 OIG Report by itself is sufficient evidence of a failure to train under *Monell*.  Although courts in this district have evaluated arguments premised on this report in connection with *Monell* claims, most have done so at

the pleading stage. *See, e.g.*, *Marlin v. City of New York*, No. 15-cv-2235 (CM), 2016 WL 4939371, at

*19-21 (S.D.N.Y. Sept. 7, 2016) (discussing the OIG Report in connection with a motion to dismiss

the plaintiff's claims that the City of New York failed to train, supervise, or discipline officers);

*Boddie v. City of New York*, No. 15-cv-4275 (GHW), 2016 WL 1466555, at *3-5 (S.D.N.Y. Apr. 13,

2016) (same); *Delorbe-Bell v. City of New York*, No. 15-cv-2344 (LGS), 2016 WL 1451581, at *3

(S.D.N.Y. Apr. 12, 2016) (same). While the parties dispute whether this case should be controlled

by *Marlin*, which found that allegations based on the OIG Report were sufficient to withstand a

motion to dismiss, or *Boddie*, which concluded otherwise, the issue at this stage of litigation is not

whether the OIG Report pleads sufficient facts to allow the case to move forward. The question is

instead whether the report by itself provides sufficient evidence to demonstrate a dispute of material

fact that should be decided by a jury. The Court concludes that on this record, the report is

insufficient to create a genuine dispute of material fact in connection with Plaintiffs' *Monell* claim.

Assuming for purposes of this motion that the 207 substantiated allegations of excessive

force provided the City with notice of excessive force within the NYPD, the report does not

establish that the City was deliberately indifferent to any related training deficiencies. Quite the

opposite—the report suggests that any deficiencies were not "so obvious" or "so likely to result in a

deprivation of federal rights" that the City's failure to correct the deficiencies could constitute

deliberate indifference. *Reynolds*, 506 F.3d at 192; *see id.* ("[A] city's failure to train its subordinates

satisfies the policy or custom requirement only where the need to act is so obvious, and the

inadequacy of current practices so likely to result in a deprivation of federal rights, that the

municipality or official can be found deliberately indifferent to the need." (citing *City of Canton*, 489

U.S. at 390)). The report's introduction describes the total number of substantiated force

allegations, 207, as "a notably modest number, given the size of the NYPD, and a positive indication

of the NYPD's restraint." DeSimone Decl., Ex. G at 1. The report also explains that the total

number of substantiated allegations represents a mere two percent of the approximately 10,000 complaints of force lodged with the CCRB between 2010 and 2014. *Id.* at 2 n.1. Thus, the number of substantiated uses of unlawful force during those years was very small relative to the size of the police force and the number of unsubstantiated complaints. At the time of the alleged use of force here, this report had not been published. Therefore, the report itself is not evidence that any link suggested by the report between the small number of substantiated complaints and the deficient training programs was obvious to the City when, or before, Plaintiffs were pulled over and removed from their truck.

Even if the City had been on notice of the deficient use-of-force training program and the deficiency's likelihood to lead to unlawful use of force, summary judgment is still appropriate because Plaintiffs point to no evidence of the causal link between that deficient training and the violations alleged here. *See Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) ("[I]nherent in the principle that a municipality can be liable under § 1983 only where its policies are the moving force behind the constitutional violation is the concept that the plaintiff must show a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." (internal quotation marks, brackets, and citations omitted)). In both their complaint and their opposition, Plaintiffs state in conclusory fashion that the City's failure to train directly and proximately caused the alleged excessive force used against them. *See* Compl. ¶ 56; Pl.'s Opp. at 9. However, they point to no record evidence in support of causation. Therefore, to conclude that the OIG Report creates a genuine dispute of fact, the Court must make the inferential leap that, but for the City's failure to properly train its police officers, the alleged constitutional violations would have not occurred. At this stage, the Court must draw all *reasonable* inferences in favor of Plaintiffs as the non-moving party. *See Amnesty*, 361 F.3d at 122. However, based on its own review of the record, the Court is unwilling to make the unreasonable jump required to find evidence of causation.

First, Plaintiffs fail to connect the reported deficiencies in de-escalation training with the alleged use of force here. Viewing the facts in the light most favorable to Plaintiffs, Plaintiffs were peacefully sitting in their truck at the time that police officers approached them with guns drawn, pulled them from the vehicle, and forced them to the ground. According to Plaintiffs, there was no prior interaction between them and the officers. Nor did there exist a situation that otherwise had escalated and was therefore in need of de-escalation. Accordingly, on this record, it is implausible that a causal connection exists between any failure to properly train police officers in de-escalation tactics and the force allegedly used here. *See Boddie*, 2016 WL 1466555, at *5.

Turning to the allegedly deficient use-of-force training, both police officers here testified in deposition that they received training during their police careers. Officer Leddy, who has been a police officer since July 2002, testified that he underwent nine months of training at the police academy followed by an additional six months of field training. DeSimone Decl., Ex. C at 5:22-24, 7:5-23. Similarly, Office Pappalardo, who has been a police officer for nineteen years, testified that he was trained at the police academy and also in the field. DeSimone Decl., Ex. D. at 6:2-5, 7:16-23, 9:4-16. The City asserts that the OIG Report was not produced or otherwise referenced during discovery. Def.'s Reply Mem., ECF No. 59 ("Def.'s Reply") at 3.[6] This is reflected in counsel's deposition questioning, which did not inquire specifically about the officers' training on the use of force. Instead, the questioning focused on the officers' training in connection with probable cause, the stop-and-frisk policy, and Officer Leddy's gang training. *See* DeSimone Decl., Ex. C at 10:16-20, 171:21-24, 172:9-24; DeSimone Decl., Ex. D at 12:4-19, 15:7-19. Therefore, the record shows that each of these officers did receive training, but it is otherwise silent on the nature of any use-of-force

---

[6] The City contends that, because Plaintiffs did not produce the OIG Report during discovery, they are precluded under Federal Rule of Civil Procedure 37(c)(1) from relying on it in opposing summary judgment. However, this report was likely in the possession, custody, or control of the City, as it was prepared by the NYPD's OIG. Regardless, the Court does not find the report to be sufficient evidence to withstand summary judgment, and the Court need not address the City's Rule 37 argument.

training that was, or was not, provided to them.

Moreover, the statistical findings of the OIG undermine an implied causal link here.  As just explained, the report characterizes the total number of substantiated force complaints as modest and as comprising only two percent of the total force complaints presented to the CCRB.  The report goes on to describe in chart format the average number of substantiated complaints based on type and category.  Among the statistics shown are the number of officers against whom substantiated complaints of force were filed, grouped according to years of service.  A majority of the officers involved in substantiated allegations were relatively new to the police force, with seven or less years of service.  *See id.* at 13.  Only seven officers had been on the force for thirteen years, the length of Officer Leddy's tenure at the time of the incident at issue, and only five officers had served for nineteen years, the length of Officer Pappalardo's service.  *Id.*  These figures suggest that the rate of unlawful use of force is proportional to the experience of a police officer, and that officers with the experience of Officers Leddy and Pappalardo are much less likely to use unlawful force than their more junior colleagues.  Officers Leddy and Pappalardo did testify that they did not undergo routine training since their training at the academy, with the exception that Officer Leddy was in counterterrorism training at the time of his deposition.  *See* DeSimone Decl., Ex. C at 10:8-15; DeSimone Decl., Ex. D at 15:7-19.  However, the more junior officers identified in the OIG Report, those with higher rates of substantiated force complaints, would have trained in the police academy more recently than their more senior counterparts.  Therefore, the report's figures by themselves do not support an inference that a lack of recent use-of-force training led senior Officers Leddy and Pappalardo to use unlawful force against Plaintiffs.

Weighing perhaps more heavily against an inferred causal link is the fact that the OIG Report analyzed complaints between 2010 and 2014 and did not include complaints from 2015, the year in which officers are alleged to have used excessive force against Plaintiffs.  The report does not

suggest that the NYPD did nothing between 2014 and 2015 to improve its training or to otherwise curtail the unlawful use of force. In fact, the report states otherwise: it describes a "Smart Policing" training program that was first implemented in December 2014 and has been modified and redesigned since. *Id.* at 41-42. That training program includes midnight training sessions for officers, like Officers Leddy and Pappalardo, who are assigned to late-night shifts. *Id.* at 42.

Therefore, while the OIG Report might serve as evidence of the City's liability under Section 1983 where a fully developed record demonstrates that the City's deliberate indifference persisted at the time of an alleged constitutional violation and was in fact the cause of that violation, the report cannot do the same here. Plaintiffs simply have not developed evidence of the causal connection between any deliberate indifference by the City from 2010 to 2014 and the incidents that occurred here.[7]

### 2. Failure to Discipline or Enforce Policies and Procedures

The Second Circuit has recognized that the "stringent causation and culpability requirements" applicable to a claim premised on a city's failure to train its employees "have been applied to a broad range of supervisory liability claims," including claims based on a failure to discipline. *Reynolds*, 506 F.3d at 192 (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 127 (2d Cir. 2004); *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994)).

Plaintiffs point to no evidence in the record regarding the City's failure to discipline its police officers. Instead, they again rely on the 2015 OIG Report, which sets forth findings and recommendations in connection with the discipline of officers. It explains that, under the

---

[7] Interestingly, in *Marlin*, the primary case relied upon by Plaintiffs in which Chief Judge McMahon found that the substantiated complaints in the OIG Report put the City on notice prior to the report's publication and therefore provided factual support for the plaintiff's *Monell* claim sufficient to survive dismissal, Chief Judge McMahon explained that the plaintiff should develop in discovery further information regarding the report, such as when the report was commissioned and for what reason. *See Marlin v. City of New York*, No. 15-cv-2235 (CM), 2016 WL 4939371, at *20 (S.D.N.Y. Sept. 7, 2016). While Plaintiffs have relied on Chief Judge McMahon's ultimate ruling, they have apparently ignored her reasoning and have failed to work to develop the evidentiary record to support their *Monell* claim.

disciplinary process in place at the time of the report, it was "impossible to determine how much of the sanction [could] be attributed to each distinct charge."  DeSimone Decl., Ex. G at 61.  Therefore, the report does not contain detailed statistics regarding discipline administered specifically for excessive use of force.  However, the report notes that the percentage of cases in which the NYPD decided against disciplining officers declined rather drastically between 2013 and 2014, from 44.1% to 11.1%.  *Id.* at 47.  The report also states that the CCRB revised its policy regarding the reconsideration or reopening of cases in December 2014.  *Id.* at 56.  Since implementation of that revised policy, the report notes that the NYPD has sent a larger number of cases back to the CCRB for reconsideration in lieu of departing downward in the disciplinary measures imposed.  *Id.* at 57.  These findings suggest that, by July 2015, steps were being taken to ensure broader enforcement of the NYPD's policies and procedures.  Therefore, for largely the same reasons that Plaintiffs fail to present any material evidence of the City's deliberate indifference to the NYPD's deficient training program, they also fail to point to evidence that raises any genuine issue of fact with respect to the City's alleged failure to discipline its police officers.

Were liability to be imposed on the City on the sole basis of a report prepared by a municipal agency—and in this case, a report that was commissioned in an effort to *improve* policing—any plaintiff with a claim arising during or after the period covered by the report could prove municipal liability.  Agencies would be discouraged from self-evaluation and proactive improvement programs, and the end result would be the very thing that Section 1983 plaintiffs seek to curb, the City's asserted failure to autocorrect.  More than this internal report card is needed to hold the City liable here.

### 3. Municipal Liability for Denial of Medical Care

Plaintiffs argue that the OIG Report establishes *Monell* liability.  However, that report addresses only the unlawful use of force.  It does not address substantiated complaints for denial of

medical care. Plaintiffs do not otherwise point to any evidence in the record of a policy or custom of deliberate indifference to individuals' medical needs.

* * *

For all of the above reasons, the City is entitled to summary judgment on Plaintiffs' Section 1983 claim.

### B. State Law Claims

Plaintiffs' remaining claims for assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, *respondeat superior*, and negligent hiring, retention, and supervision all arise under New York State law. As a preliminary matter, the Court must first determine whether it has jurisdiction over these claims. *See Blumatte v. Quinn*, 521 F. Supp. 2d 308, 310 (S.D.N.Y. 2007) ("Subject matter jurisdiction is a threshold inquiry a Court must answer before addressing the merits of a claim." (citing *Gutierrez v. Fox*, 141 F.3d 425, 426 (2d Cir. 1998))).

The complaint alleges that Plaintiffs were domiciled in New York at the time this case was filed. *See* Compl. ¶¶ 6-7. Because the parties are non-diverse, Plaintiffs' state law claims are before the Court as a matter of supplemental jurisdiction. *See* 28 U.S.C. § 1332(a)(1) (providing for original diversity jurisdiction over civil cases where the amount in controversy exceeds $75,000 if the case is between citizens of different states); 28 U.S.C. § 1367(a) (federal district courts have supplemental jurisdiction over state law claims "that are so related to" federal claims "that they form part of the same case or controversy"). Supplemental jurisdiction is "discretionary," *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997), and a district court "may decline to exercise supplemental jurisdiction over a claim" if it "has dismissed all claims over which it has original jurisdiction," 28 U.S.C. § 1367(c). As the Court has dismissed the Section 1983 claims against the unnamed individual defendants and granted Defendant summary judgment on Plaintiffs' *Monell* claim, all claims over which the Court has original jurisdiction have been dismissed. Accordingly, the Court

declines to exercise jurisdiction over Plaintiffs' state law claims.

### C. Claims Against John Doe Police Officers

Plaintiffs bring claims for excessive force and denial of medical care against John Doe Police Officers. *See* Compl. ¶¶ 32-44. The complaint has not been amended to identify those Doe defendants. Accordingly, because the Court has granted summary judgment on the claims against the only defendant currently in the case, the City of New York, it must decide whether it would grant leave to amend the complaint at this stage to identify the Doe defendants or close this case.

The Court entered its Federal Rule of Civil Procedure 16 scheduling order on January 24, 2017. ECF No. 17. "Where a scheduling order has been entered, the lenient standard under Rule 15(a), which provides leave to amend 'shall be freely given,' must be balanced against the requirement under Rule 16(b) that the Court's scheduling order 'shall not be modified except upon a showing of good cause.'" *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003) (quoting Fed. R. Civ. P. 15 and 16). The Court's January 24, 2017 scheduling order established the deadline for amendments to the complaint, except for those permitted under Rule 15(a)(1), and for the addition of parties as thirty days from the date of the order, *i.e.*, February 23, 2017. *See* ECF No. 17. In the nearly fifteen months that have transpired since the Court issued its scheduling order, Plaintiffs have not sought leave to amend the complaint to substitute the names of any identified police officers for the John Doe defendants. Nor have Plaintiffs sought an extension of the deadline by which to add parties. Plaintiffs' submissions to the Court also do not reflect an intention to amend their complaint to identify individual police officers. In a July 20, 2017 letter requesting an extension of the discovery deadlines of the scheduling order, but without addressing the deadline to amend or add parties, Plaintiffs explained that the extension of time was needed to permit them to depose "a *non-party witness*, Police Officer Leddy." ECF No. 21 (emphasis added). In an August 3, 2017 letter to the Court, Plaintiffs refer to Officers Leddy and Pappalardo as "witnesses" rather than

"defendants."  ECF No. 23.  Likewise, in a November 22, 2018 letter, Plaintiffs characterize

Officers Leddy and Pappalardo as "the offending officers" and "defendants' representatives."  ECF

No. 36.

This case was filed on July 5, 2016.  Fact discovery closed on September 8, 2017, after four

extensions of the original discovery deadlines.  Plaintiffs were aware of the identities of Officers

Leddy and Pappalardo as early as November 21, 2016, when the City served its Rule 26(a) initial

disclosures.  *See* ECF No. 23 at 1.  Plaintiffs therefore had at least nine months within which they

could have requested leave to amend their complaint to name the John Doe officers prior to the

close of discovery.  Yet they chose not to.  Nor have Plaintiffs raised this issue in their opposition to

the City's summary judgment motion.

In light of these factors, the Court dismisses the claims against the Doe defendants and

closes this case.

## IV.    CONCLUSION

For the reasons stated above, the City's motion for summary judgment is GRANTED.  The

claims against the John Doe defendants are dismissed.

The Clerk of Court is directed to terminate all pending motions, adjourn all conferences, and

close this case.

SO ORDERED.

Dated:  May 9, 2018
New York, New York

_____
GREGORY H. WOODS
United States District Judge